UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>**BF LABS, INC., d/b/a BUTTERFLY LABS**, a Wyoming corporation; **DARLA DRAKE**, an individual; **NASSER GHOSEIRI**, an individual; and **SONNY VLEISIDES**, an individual.<br><br>    Defendants. | CASE NO. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 57b, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the marketing and sale of Bitcoin mining machines.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 57b.

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), (c)(3), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(B), and 57b.

## DEFENDANTS

6. Defendant BF Labs, Inc., d/b/a "Butterfly Labs" (hereinafter, "Butterfly Labs"), is a Wyoming corporation with its principal place of business in Johnson County, Kansas. Butterfly Labs also has operated from Kansas City, MO and maintained a P.O. Box in Kansas City, MO.

7. Defendant Darla Drake, a/k/a Jody Drake (hereinafter, "Drake") is the General Manager at Butterfly Labs. Drake also serves as the Secretary and Treasurer at Butterfly Labs. At all times material to this complaint, Drake, individually, or in concert with others, controlled the acts and practices of Butterfly Labs, including the acts and practices set forth in this

complaint. Drake, in connection with the matters alleged herein, transacts or has transacted business in this district.

8. Defendant Nasser Ghoseiri (hereinafter, "Ghoseiri") is the President and Innovation Officer/Chief Technology Officer at Butterfly Labs. At all times material to this complaint, Ghoseiri, individually, or in concert with others, controlled the acts and practices of Butterfly Labs, including the acts and practices alleged in this complaint. Ghoseiri, in connection with the matters alleged herein, transacts or has transacted business in this district.

9. Defendant Sonny Vleisides (hereinafter, "Vleisides") is a Founder and Innovation Officer at Butterfly Labs. At all times material to this complaint, Vleisides, individually or in concert with others, controlled the acts and practices of Butterfly Labs, including the acts and practices alleged in this complaint. Vleisides, in connection with the matters alleged herein, transacts or has transacted business in this district.

## COMMERCE

10. At all times material to this complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

11. Defendants operate Butterfly Labs, which sells Bitcoin mining machines and services that consumers purportedly can use to generate Bitcoins, a form of virtual currency worth hundreds of dollars per unit. Defendants have charged consumers between $149 and $29,899 upfront for the machines and services. In many instances, consumers who have purchased the machines or services cannot use them to generate Bitcoins because Defendants never provide them with the machines or services.

12. In numerous other instances, even where Defendants have provided the machines, they have done so after significant delays, resulting in machines that are obsolete or have depreciated significantly toward obsolescence, or the machines have arrived damaged or defective. As a result, consumers have not been able to use the machines to generate a profit or return on investment. Defendants also frequently have not provided refunds to consumers who have not received the machines or who have received the machines after a substantial delay.

### Background on Bitcoins and Bitcoin Mining

13. Bitcoin is a payment system that is also referred to as a "virtual currency." Bitcoins can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other physical or virtual currencies. Bitcoins users can send payments to another for goods and services through online entities. Bitcoins have significant monetary value that constantly fluctuates. For example, from November 2013 to May 2014, an individual Bitcoin's value has fluctuated from a high of over $1,000 to a low of $400.

14. The Internal Revenue Service has stated that Bitcoins are not currency, but rather, are taxable as valued property. Unlike traditional currency, Bitcoins are not created by a government or central bank, such as the Federal Reserve.

15. Because Bitcoins do not have a central bank for distribution, Bitcoins can only be generated through a process called Bitcoin "mining." Bitcoin "miners" are consumers who receive transaction fees and newly minted Bitcoins in return for solving computational puzzles using their computers. Once a miner, via his computer, solves the computational puzzle, the Bitcoin network awards a specific number of Bitcoins to him.

16. Although the total number of Bitcoins is increasing through the mining process, the number is increasing at a reduced rate, and, at some point, Bitcoins will cease to be

4

generated altogether. Specifically, roughly every four years that the Bitcoin network operates, half the amount of Bitcoins are created as compared to the prior four years. For example, a miner solving the computational puzzle could earn a reward of 50 Bitcoins in 2008, but that reward halved in 2012 to 25 Bitcoins, and it will drop to 12.5 Bitcoins in 2016. Thus, the total number of Bitcoins in existence will never exceed 21,000,000 and all Bitcoins are expected to be mined by 2140.

17. As more miners have joined the Bitcoin network, it has become increasingly difficult to solve the computational puzzles before another miner and make a profit. Therefore, miners must seek faster and faster equipment, and must seek efficiencies to cut their operating costs, which includes high electricity bills and wear-and-tear of the mining machine.

18. Initially, Bitcoin mining started as a process that miners could undertake using a personal computer. However, as more miners joined the network and the difficulty of Bitcoin mining increased, the computer hardware required to profitably mine Bitcoins evolved from general purpose CPUs (found in common desktop computers) to specialized computers and chips whose sole purpose is for performing the calculations necessary for Bitcoin mining.

19. With the development and release of each new generation of mining technology, previous generations become effectively obsolete and worthless. Given the finite number of Bitcoins being produced, the increasing number of miners and complexity of the computational puzzles, and the introduction of faster and more specialized equipment, obtaining the most cutting-edge technology in a timely manner is paramount for any consumer to successfully make a profit by mining for Bitcoins.

**Defendants' Sale of Bitcoin Mining Machines**

20.     Defendants purport to manufacture and sell Bitcoin mining machines and services that consumers can use to generate Bitcoins. Defendants also purport to sell the latest generations of Bitcoin mining machines.

21.     Defendants market their Bitcoin mining machines and services for sale on their website, www.butterflylabs.com, stating that "Butterfly Labs manufactures a line of high speed encryption processors for use in Bitcoin mining, research, telecommunication and security applications." The website describes products for sale and their prices, delivery dates, and terms and conditions of sale. It touts the low power consumption and high efficiency and processing speed of Defendants' mining machines.

22.     Defendants also market their Bitcoin mining machines and services for sale on Facebook.  For example, in November 2012, Defendants posted a link on the company Facebook page to a calculator that enables consumers to calculate the return on investment, or ROI, for their Bitcoin mining machines.  The post reads, "Measure your ROI with this cool Bitcoin mining calculator."  The description of the calculator displayed on the page reads as follows:  "Ultimate Bitcoin Calculator. Bitcoin Mining, Profitability and Power Calculator. Calculate how much your shiny new rig is making you.  Daily, weekly, monthly and annual net profit, power consumption cost, break even time. Everything you can ever need!. . ."  Links to the calculator have appeared in other Butterfly Labs social media pages (such as Twitter and Tumblr) and on its weblog, which is accessible from the company website.

23.     The calculator, and any calculations to determine the profitability of a Bitcoin mining machine, requires consumers to input various data points, including the Bitcoin exchange rate, mining difficulty level, and cost of power.  The calculator also requires

consumers to input data points specific to the machine, such as the delivery date, power consumption, and processing power, all of which Defendants provided to consumers on their website. The calculator's output includes net hourly, daily, weekly, monthly, and annual profit, and the date by when the consumer could expect to break even on the machine and its operating costs.

24. Delivery delays between six months and one year would significantly decrease the number of Bitcoins mined by any Bitcoin mining machine.

25. For all orders, Defendants have required consumers to pay up-front by PayPal, Bitcoins, or bank wire transfer the entire amount of an order at the time the order is placed.

26. In June 2012, Defendants' website advertised its line of "BitForce SC chip" (hereinafter, "BitForce") mining machines. At the time, the BitForce mining machines purported to allow consumers to use the latest technology for Bitcoin mining. Defendants' BitForce mining machines ranged in price from $149 for their lowest power machine to $29,899 for their highest power machine.

27. Beginning in June 2012, Defendants informed consumers that the BitForce mining machine "is now in final state development. Initial product delivery is scheduled for October 2012." However, Defendants did not deliver any BitForce mining machines to its customers in October 2012. Indeed, by April 1, 2013, Defendants still had not delivered a single BitForce mining machine to their customers.

28. Many months later, as of September 2013, Defendants had failed to ship mining machines to more than 20,000 customers who had paid for the equipment in full.

29. On November 28, 2013, Defendants posted on their website that all the orders for the BitForce mining machines had been shipped. However, consumers continued to file complaints about not receiving their prepaid BitForce mining machine.

30. In approximately August 2013, Defendants announced that they were selling Monarch mining machines, which purportedly possessed greater mining power than any of the previous mining machines in the market. Butterfly Labs stated that the Monarch is the "fastest and most power efficient Bitcoin miner yet." Defendants required consumers to pay $2,499 to $4,680 upfront to purchase the machines.

31. In fact, Defendants have yet to provide consumers with a single Monarch machine, despite Defendants' representation that the machines should be delivered by the "end of the year [2013]." Months later, in approximately March 2014, Defendants stated that they would provide consumers with Monarch machines in April 2014. As of August 2014, Defendants had yet to ship a single Monarch machine.

32. In numerous instances, consumers were not able to generate Bitcoins using the BitForce or Monarch Bitcoin mining machines because Defendants did not fulfill consumers' orders.

33. In numerous instances, Defendants eventually delivered a BitForce that was either defective, obsolete, or mining far less Bitcoins than it would have had it shipped on the promised shipment dates.

34. In approximately December 2013, Defendants began offering mining services, at an average upfront cost of approximately $10/GH for 12 months, whereby Butterfly Labs supposedly would use the Monarch mining machines to generate Bitcoins for the consumer. A gigahash is a measure of computation power in Bitcoin mining. A mining service company

estimates that in order to generate a significant amount of Bitcoins, a consumer would need to purchase 1000 GH per year. Defendants stated that the service would allow consumers to "harness the power of the latest Bitcoin mining technology" without any "technical knowledge." Butterfly Labs stated that they would begin generating Bitcoins for consumers who paid for these services in the "March 2014 time frame." Defendants failed to do so. In fact, as of August 2014, Defendants had not generated any Bitcoins for consumers who had purchased the mining services, often at a cost of thousands of dollars per consumer.

### Refunds

35. At times, Defendants have claimed that they would provide refunds; at other times, they have stated that they have a no-refund policy. Regardless of which purported policy was in place at the time, Defendants have often failed to provide refunds to consumers, even though they have not provided consumers with promised products or services or consumers have not received products or services for many months.

36. In numerous instances, consumers have tried to contact Defendants to cancel their orders and obtain refunds, but have been unable to reach Defendants.

### VIOLATIONS OF THE FTC ACT

37. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

38. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

39. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Bitcoin mining machines and services, Defendants have represented, expressly or by implication, that:

      a.  Consumers will be able to use the machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins, or

      b.  Defendants will deliver Bitcoin mining machines or services to consumers in a timely fashion.

40.     In truth and in fact, in numerous instances, consumers have not been able to use the machines or services to generate Bitcoins at all or have only been able to generate a fraction of the Bitcoins represented because they have not received the machines or services, or in a timely fashion.

41.     Therefore, the representations set forth in Paragraph 39 were and are false and misleading, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

42.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

43.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;

B. Enter a permanent injunction to prevent future violations of the FTC Act Rule by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: September 15, 2014                    Respectfully submitted,

JONATHAN E. NUECHTERLEIN
General Counsel

 /s/ Helen Wong
HELEN WONG, DC Bar # 997800
hwong@ftc.gov
TERESA KOSMIDIS, NY Bar # 4533824
tkosmidis@ftc.gov
LEAH FRAZIER, DC Bar # 492540
lfrazier@ftc.gov

```
                                        Federal Trade Commission
                                        600 Pennsylvania Ave., N.W., Mail Stop-CC 10232
                                        Washington, D.C. 20580
                                        Telephone: 202-326-3779
                                        Telephone: 202-326-3216
                                        Telephone:  202-326-2187
                                        Facsimile:  202-326-3768

                                        TAMMY DICKINSON
                                        United States Attorney

Dated: September 15, 2014                /s/ Charles M. Thomas
                                        Charles M. Thomas, MO Bar #28522
                                        Assistant United States Attorney
                                        Charles Evans Whittaker Courthouse
                                        400 East Ninth Street, Room 5510
                                        Kansas City, MO  64106
                                        Telephone:  (816) 426-3130
                                        E-mail:  charles.thomas@usdoj.gov

                                        Attorneys for Plaintiff
                                        FEDERAL TRADE COMMISSION
```

JS 44 (Rev 09/10)

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## CIVIL COVER SHEET

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

**Plaintiff(s):**
First Listed Plaintiff:
Federal Trade Commission ;
**County of Residence:** Outside This District

**Defendant(s):**
First Listed Defendant:
BF Labs, Inc. ;
**County of Residence:** Outside This District

Additional Defendants(s):
Darla Drake ;
Nasser Ghoseiri ;
Sonny Vleisides ;

**County Where Claim For Relief Arose:** Jackson County

**Plaintiff's Attorney(s):**

Helen Pei Ying Wong ( Federal Trade Commission)

600 Pennsylvania Avenue, NW, Mail Stop CC-10232
Washington, DC 20580
**Phone:** 202-326-3779
**Fax:** 202-326-3678
**Email:** hwong@ftc.gov

Teresa N. Kosmidis ( Federal Trade Commission)

600 Pennsylvania Ave., NW, Mail Stop CC-10232
Washington, DC 20580
**Phone:** 202-326-3216
**Fax:** 202-326-3768
**Email:** tkosmidis@ftc.gov

Leah Ei Wha Frazier ( Federal Trade Commission)

600 Pennsylvania Ave., NW, Mail Stop CC-10232
Washington, DC 20580
**Phone:** 202-326-2187
**Fax:** 202-326-3768
**Email:** lfrazier@ftc.gov

**Defendant's Attorney(s):**

**Basis of Jurisdiction:** 1. U.S. Government Plaintiff

**Citizenship of Principal Parties** (Diversity Cases Only)

    **Plaintiff:** N/A

    **Defendant:** N/A

**Origin:** 1. Original Proceeding

**Nature of Suit:** 890 Other Statutory Actions

**Cause of Action:** 15 U.S.C. 45(a). Violation of Section 5(a) of the FTC Act.

**Requested in Complaint**

    **Class Action:** Not filed as a Class Action

    **Monetary Demand (in Thousands):**

    **Jury Demand:** No

    **Related Cases:** Is NOT a refiling of a previously dismissed action

---

**Signature:** Helen P. Wong

**Date:** 9/15/2014

    If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.